ELIZABETH B. FORSYTH (CA Bar No. 288311)
eforsyth@earthjustice.org
EARTHJUSTICE
810 3rd Avenue #610
Seattle, WA 98104
Tel: (206) 531-0841

GREGORY C. LOARIE (Bar No. 215859)
gloarie@earthjustice.org
EARTHJUSTICE
180 Steuart St. #194330
San Francisco, CA 94105
Tel: (415) 217-2000

*Counsel for Plaintiffs*

(*Additional Counsel of Record Listed in Signature Block*)

IN THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and SIERRA CLUB,<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>U.S. BUREAU OF LAND MGMT.; DOUG BURGUM, Secretary of Interior; LANNY ERDOS, Acting Assistant Secretary for Land and Minerals Management; JOSEPH STOUT, California Director, Bureau of Land Mgmt.; MARC STAMER, Acting California Desert District Manager, Bureau of Land Mgmt.; RONALD NUCKLES, Needles Field Office Manager, Bureau of Land Mgmt.,<br><br>　　　　Defendants. | No.:　2:26-cv-08287<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

**INTRODUCTION**

1.      This case challenges a renewed decision by defendants U.S. Bureau of Land Management (collectively, "BLM") to issue a right-of-way to convey water through a mothballed oil and gas pipeline that crosses Mojave Trails National Monument and other protected federal public land in southeastern California, without accounting for the significant environmental impacts this approval will have. BLM's decision granting a right-of-way to Fenner Gap Mutual Water Company ("FGMWC") allows a private company, "Cadiz," to implement the so-called "Cadiz Valley Water Conservation, Recovery and Storage Project" (or "Cadiz Water Project"), a longstanding scheme to sell groundwater extracted from the ancient aquifer basin underlying the Mojave Desert.

2.      BLM's decision will have a devastating impact on the fragile desert environment. Conversion and use of the oil and gas pipeline for water will make it possible for Cadiz to extract far more groundwater from the desert aquifer than is replenished naturally, causing overdraft in the affected groundwater basin in and around Mojave Trails National Monument. The resulting drawdown of the water table will cause many freshwater springs of critical importance to desert plants and animals to go dry. The retreating aquifer will also desiccate desert "playa" lakebeds, resulting in toxic air pollution from windswept sediments akin to what has plagued the Owens Valley to the north ever since large-scale water diversions to Los Angeles dried Owens Lake a century ago.

3.      Construction of the pipeline conversion from oil and gas to water itself will also cause substantial environmental harm even before any groundwater is pumped. To convert the dormant oil-and-gas pipeline into a water conveyance system, Cadiz must undertake extensive construction activities across public lands, including the construction and improvement of access roads, installation of pumping infrastructure, and repeated use of heavy-duty construction equipment over 1,346 acres—a geographic area more than ten times larger than Disneyland. These activities

Complaint for Declaratory & Injunctive Relief

will fragment desert habitat, disturb sensitive biological resources, and generate significant air pollution in an area that already suffers from poor air quality.

4. This is not the first time the court has been asked to step in to stop BLM from illegally approving this environmentally devastating project without adequate review. BLM initially issued approval for this project to proceed in 2020. Plaintiffs brought suit against BLM, challenging BLM's failure to comply with the Federal Land Policy and Management Act ("FLPMA"), the Proclamation Establishing Mojave Trails National Monument, and the National Environmental Policy Act ("NEPA") because BLM granted approval without evaluating the impacts of water drawdowns on the environment. Rather than defend against its unlawful decision, BLM admitted it should have accounted for the effects of the project on water drawdowns, and it sought a voluntary remand. The court granted BLM's request, agreeing that BLM had violated its duties under FLPMA, the Proclamation Establishing Mojave Trails National Monument, and NEPA.

5. BLM has now re-approved the project, but instead of correcting the legal errors identified by the Court, it has reversed course on its prior admission. After previously conceding that its approval required consideration of the environmental consequences of the groundwater extraction it would enable, BLM now claims those impacts fall outside the scope of its review. BLM is wrong. BLM also unlawfully approved the right-of-way without adequately analyzing the project's impacts on groundwater-dependent resources, desert air quality, and other protected public-land values; without preparing an Environmental Impact Statement despite significant environmental effects; without conducting the public participation process required by federal law; and without complying with the Clean Air Act's requirements. In doing so, BLM ignored both its prior position and the Court's ruling, and once again illegally authorized a project that threatens significant harm to Mojave Trails National Monument and public lands and resources of the surrounding fragile desert ecosystem.

Complaint for Declaratory & Injunctive Relief

6.     To remedy these violations of federal law, Plaintiffs Center for Biological Diversity and Sierra Club again ask the court to set aside BLM's illegal issuance of the right-of-way and enjoin BLM from authorizing or otherwise allowing FGMWC or Cadiz to undertake any activities within the right-of-way until BLM complies with governing statutory requirements.

### JURISDICTION AND VENUE

7.     This action arises under NEPA, 42 U.S.C. §§ 4321–47, the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401–7671q, FLPMA, 43 U.S.C. §§ 1701–87, the California Desert Protection Act ("CDPA"), Pub. L. No. 103–433, 108 Stat. 4471 (1994), the National Landscape Conservation System Act, 16 U.S.C. §§ 7201–03, the Proclamation Establishing the Mojave Trails National Monument, Proclamation No. 9395, 81 Fed. Reg. 8371 (Feb. 12, 2016), the Dingell Act, 16 U.S.C. §§ 410aaa–81c, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, which waives the defendants' sovereign immunity. The Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705–06.

8.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (United States as defendant). An actual justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1), because a substantial part of the public land that is the subject of this action lies in this District.

10.     Assignment to the Western Division of this Court is proper under General Order No. 26-11 I.B.1.a(1)(b).

### PARTIES

11.     Plaintiff Center for Biological Diversity ("the Center") is a national non-profit conservation organization with over 123,000 members dedicated to the protection of biodiversity and ecosystems throughout the world. The Center works through science, law, and creative media to secure a future for all species, great and small, hovering on the brink of extinction, with a focus on protecting the lands, waters

Complaint for Declaratory & Injunctive Relief

and climate that species need to survive. The Center has offices in California and over 22,851 members across the state, and it is actively involved in species and habitat protection in the California desert, including on the federal lands at issue in this case.

12. Plaintiff Sierra Club is a national nonprofit organization with sixty-three chapters and more than 640,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club has over 120,000 members in California, and led by the Sierra Club's San Gorgonio Chapter, has worked to conserve and restore the Mojave Desert for decades.

13. Plaintiffs have members who live, work, and recreate in the Mojave Desert region in the vicinity of the Cadiz Water Project and the pipeline route. Plaintiffs' members and supporters enjoy, on a continuing basis, public lands within Mojave Trails National Monument and other public lands that will be affected by the Cadiz Water Project and pipeline conversion construction. In a land where water is scarce and precious, Plaintiffs' members have visited freshwater springs that will be impacted by the Cadiz Water Project, including Bonanza Spring, to observe rare plants and animals and find solace and renewal, and they intend to continue to do so in the future. Plaintiffs' members derive professional, scientific, aesthetic, recreational, and educational enjoyment from the natural ecosystems that these desert springs and other riparian areas support.

14. Plaintiffs also have members who live, work, and recreate within the Mojave Desert Air Basin. These members' use and enjoyment of these areas is harmed by poor air quality, and they are concerned about activity that may further exacerbate air pollution levels, including construction allowing the pipeline's conversion to convey water. The additional pollution caused by the conversion will

Complaint for Declaratory & Injunctive Relief

worsen the already poor air quality in the affected region and harm Plaintiffs' members' use and enjoyment of these areas.

15. For example, one of the Center's members has long had an interest in the Mojave Desert, where she regularly visits for both work and for personal enjoyment. She has specifically visited Bonanza Spring, where she has watched birds, botanized, looked at aquatic and terrestrial invertebrates, and walked the full length of the wetted and moist part of the oasis, and she plans to do so again this fall when the weather cools down. The construction and water mining and extraction impacts to the Mojave Desert ecosystem area arising from the challenged action will injure her interests in and enjoyment of the public lands, especially by increasing noise, traffic, and dust along the pipeline route and road, scaring wildlife away, and potentially harming rare plants and animals in the path of construction, operation, and maintenance of the pipeline. The long-term impacts of the operation of the Cadiz pumping project and pipeline will additionally injure her interests in and enjoyment of the Mojave Desert by adversely impacting plants and animals she observes and studies, reducing scarce yet critical water resources for those same plants and animals, and further impairing the already unhealthful air quality in the region and therefore the wide-open vistas that have made the Mojave Desert famous.

16. As another example, one of Sierra Club's members lives within the Mojave Desert Air Basin and has long had interests in preserving the resources of the Mojave Desert, where he lives and regularly recreates, observes wildlife, and studies paleontological resources. For example, he has hiked in areas within the Mojave Trails National Monument including Trilobite Wilderness where he searched for trilobites, Marble Mountains, and the Cady Mountains where he has observed desert bighorn sheep; he is interested in preserving the resources of these places for himself and so that his grandchildren will continue to have the opportunity to visit these places in the future. He plans to visit Bonanza Spring in the fall of 2026. He is concerned that construction impacts to the Mojave Desert ecosystem area will injure his interests in

Complaint for Declaratory & Injunctive Relief

and enjoyment of the public lands and could exacerbate already poor air quality where he lives. He is particularly concerned that the water extraction from the operation of the Cadiz pumping project and pipeline will deplete ancient "paleo" water from this desert aquifer that cannot be replenished in decades or even centuries. He is concerned that drawdown of this aquifer will have long-term impacts to plants and animals in the Mojave Trails National Monument and surrounding areas including impacts to ancient yuccas and Joshua trees and will deplete live-giving springs in this dry desert environment. He is also concerned that the groundwater monitoring for the pumping project to protect springs is insufficient because it does not require pumping to cease or decline when impacts are observed and does not take into account the delay in recovery of groundwater systems even after pumping ceases or declines.

17.    Plaintiffs have been, are being, and will continue to be adversely affected and irreparably injured by BLM's decision to issue FGMWC a right-of-way that will allow Cadiz to convey water through the oil and gas pipeline at issue, which is necessary for Cadiz to carry out the Cadiz Water Project. The interests of Plaintiffs' members described above will be injured not only by the noise, pollution, and adverse impacts to plants and wildlife associated with construction, operation, and maintenance of the pipeline and other infrastructure for the Cadiz Water Project, but also by the drawdown of the aquifer that will result from operation of the Project. The drying of desert springs and riparian areas, as well as the air pollution caused by excessive drying of desert lakebeds, will cause Plaintiffs and their members to suffer actual injury-in-fact that is both concrete and particularized.

18.    One of the core business activities of the Plaintiff organizations is participating in decision-making processes related to management of public lands, including in the California Desert. Both organizations have sought to comment and participate in BLM's decision to issue a right-of-way to Cadiz. These organizations would have reviewed and commented on a draft NEPA document, Dingell Act compliance, and Clean Air Act conformity determination for the right-of-way if

7

Complaint for Declaratory & Injunctive Relief

provided an opportunity to do so, but they were provided no such opportunity. BLM's unlawful issuance of the right-of-way without any opportunity for public participation directly harms Plaintiff organizations' ability to engage in their core business activities.

19.     Defendant Bureau of Land Management is the administrative agency within the U.S. Department of Interior responsible for managing the public land surrounding much of the Cadiz Water Project and underlying much of the right-of-way at issue.

20.     Defendant Doug Burgum is Secretary of the U.S. Department of Interior and sued in his official capacity as such.

21.     Defendant Lanny Erdos is the Acting Assistant Secretary for Land and Minerals Management for the U.S. Department of Interior and Director of the Office of Surface Mining and sued in his official capacity as such.

22.     Defendant Joseph Stout is BLM's California State Director and sued in his official capacity as such.

23.     Defendant Marc Stamer is the Acting District Manager for BLM's California Desert District and sued in his official capacity as such.

24.     Defendant Ronald Nuckles is the Field Manager for BLM's Needles Field Office and sued in his official capacity as such.

## LEGAL BACKGROUND

**The Federal Land Policy and Management Act**

25.     Congress enacted the Federal Land Policy and Management Act in 1973 to ensure that federal public land administered by BLM is "managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). FLPMA requires BLM to "take any action necessary to prevent unnecessary or undue degradation of the lands." *Id*. § 1732(b).

Complaint for Declaratory & Injunctive Relief

26. FLPMA finds the deserts of southern California are an especially rich and unique environment containing "historical, scenic, archeological, environmental, biological, cultural, scientific, educational, recreational, and economic resources." 43 U.S.C. § 1781(a)(1). The statute recognizes that California's deserts, though vast, are "extremely fragile, easily scarred, and slowly healed." *Id.* § 1781(a)(2). FLPMA finds, "the California desert environment and its resources, including certain rare and endangered species of wildlife, plants, and fishes, and numerous archeological and historic sites, are seriously threatened by air pollution . . . and pressures of increased use." *Id*. § 1781(a)(3).

27. To protect southern California's deserts for future generations, FLPMA designated 25 million acres of federal public land as the California Desert Conservation Area. 43 U.S.C. § 1781(a)(4), (c). The California Desert Conservation Area was designated "to provide for the immediate and future protection and administration of the public lands in the California desert within the framework of a program of multiple use and sustained yield, and the maintenance of environmental quality." *Id.* § 1781(b). FLPMA directs the Secretary of the Interior to develop a "comprehensive, long-range plan for the management, use, development, and protection of the public lands within the California Desert Conservation Area." *Id*. § 1781(d). Exercising this authority, BLM has adopted the California Desert Conservation Area Management Plan of 1980, as amended by both the Northern and Eastern Colorado Desert Coordinated Management Plan, and the Desert Renewable Energy Conservation Plan ("DRECP"). BLM regulations require "[a]ll future resource management authorizations and actions" to "conform" with these plans. 43 C.F.R. § 1610.5-3(a).

28. Title V of FLPMA sets forth a process by which the Secretary of Interior, acting through BLM, may "grant, issue, or renew rights-of-way over, upon, under, or through" federal land administered by BLM for, among other things, "pipelines . . . for the . . . transportation or distribution of water." 43 U.S.C. § 1761(a)(1). Any rights-

Complaint for Declaratory & Injunctive Relief

of-way granted must be consistent with Title V regulations and "any other applicable law." *Id.* § 1764(c).

29. Prior to issuing a right-of-way for a water pipeline under FLPMA, the applicant must submit substantial analysis, and the Secretary of Interior, acting through BLM, must make a number of findings. For example, "prior to granting or issuing a right-of-way . . . for a new project which may have a significant impact on the environment," BLM "shall require the applicant to submit a plan for construction, operation, and rehabilitation for such right-of-way" that complies with BLM's terms and conditions. *Id.* § 1764(d). BLM's terms and conditions must, among other things, "minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment"; "protect Federal property and economic interests"; "require compliance with applicable air and water quality standards established by or pursuant to applicable Federal or State law"; and "require compliance with State standards for public health and safety, [and] environmental protection . . . ." *Id.* § 1765(a)–(b).

30. "[F]or any activity that proposes to utilize groundwater resources," the DRECP also requires that "[a] Water (Groundwater) Supply Assessment shall be prepared in conjunction with the activity's NEPA analysis and prior to an approval or authorization." The DRECP explains that "[t]he purpose of the Water Supply Assessment is to determine whether over-use or over-draft conditions exist within the project basin(s), and whether the project creates or exacerbates these conditions."

31. The DRECP imposes additional requirements for certain California Desert Conservation Area lands acquired by the United States pursuant to the Catellus Land Exchange and Donation Agreement ("Catellus Agreement"), a historic conservation agreement under which The Wildlands Conservancy acquired more than 587,000 acres of land in the Mojave Desert from the Catellus Development Corporation (a holding company created in 1984 to manage Southern Pacific's real estate holdings in California) and donated it to federal agencies. Under DRECP

10

Complaint for Declaratory & Injunctive Relief

Conservation and Management Action LUPA-LANDS-6, any proposed use of these lands must be consistent with the deed restrictions and conservation purposes governing their acquisition. DRECP LUPA-LANDS-7 further provides that activities on Catellus Agreement lands are subject to review and approval by the California State Director.

32.     FLPMA also requires BLM to "establish procedures" to "give . . . the public adequate notice and an opportunity to comment upon . . . and to participate in the preparation and execution of plans and programs for and the management of[] the public lands." 43 U.S.C. § 1739(e). The Ninth Circuit Court of Appeals recently has explained that FLPMA specifically requires BLM "to provide opportunities for public participation . . . for down-the-line decisions," including "individual land use decisions," like whether to grant a right-of-way. *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 40 (9th Cir. 2025).

**Mojave Trails National Monument**

33.     President Obama established Mojave Trails National Monument by presidential proclamation on February 12, 2016. *See* Proclamation No. 9395, 81 Fed. Reg. 8371 (Feb. 12, 2016). Stretching from Joshua Tree National Park north to Mojave National Preserve, the Monument encompasses 1.6 million acres of federal land administered by BLM within the California Desert Conservation Area. A BLM map of the Monument is reproduced below.

Complaint for Declaratory & Injunctive Relief



34.    The presidential proclamation describes the Mojave Trails area as "a stunning mosaic of rugged mountain ranges, ancient lava flows, and spectacular sand dunes." 81 Fed. Reg. at 8371. The proclamation finds the monument is "an invaluable treasure and will continue to serve as an irreplaceable national resource for geologists, ecologists, archaeologists, and historians for generations to come." *Id.* It concludes "protection of the Mojave Trails area will preserve its cultural, prehistoric, and historic legacy and maintain its diverse array of natural and scientific resources, ensuring that the prehistoric, historic, and scientific values of this area remain for the benefit of all Americans." *Id.* at 8374.

35.    An ancient underground aquifer supports a number of ecologically significant springs, seeps, and other riparian areas in and near Mojave Trails National Monument. The proclamation establishing Mojave Trails National Monument specifically identified "[t]he area's scarce springs and riparian areas such as Afton

Complaint for Declaratory & Injunctive Relief

Canyon, Chuckwalla Spring, Hummingbird Spring, Barrel Spring, and Fenner Spring" as ecological objects warranting protection. *Id.* at 8372.

**California Desert Protection Act and Public Water Reserve No. 107**

36. Congress enacted the California Desert Protection Act ("CDPA") in 1994 to, among other things, "preserve unrivaled scenic, geologic, and wildlife values associated with these unique natural landscapes," "perpetuate in their natural state significant and diverse ecosystems of the California desert," "protect and interpret ecological and geological features and historic, paleontological, and archeological sites, maintain wilderness resource values, and promote public understanding and appreciation of the California desert." Pub. L. No. 103–433, § 2(b)(1), 108 Stat. 4471, 4471–501 (1994).

37. Relevant here, as part of the CDPA, Congress designated the Bigelow Cholla Garden Wilderness, Cadiz Dunes Wilderness, Clipper Mountain Wilderness, Piute Mountains Wilderness, Sheephole Valley Wilderness, and Trilobite Wilderness areas, which are all now within the Mojave Trails National Monument. Pub. L. No. 103–433, §§ 102(2), (8), (14), (51), (61), (67). The CDPA also maintained the status of the Proposed Cady Mountains Wilderness as a Wilderness Study Area, which is also now within the Mojave Trails National Monument. *Id.* at § 104(b)(7).

38. The CDPA expressly reserved water rights for these wilderness areas to fulfill the purposes of the Act, 16 U.S.C. § 410aaa-76(a). The CDPA requires that the Secretary of the Interior "and all other officers of the United States shall take all steps necessary to protect the rights reserved . . ." *Id.* § 410aaa-76(b).

39. In addition to wilderness-reservation water rights established by the CDPA, federal law has long protected certain desert springs and waterholes through Public Water Reserve No. 107. In 1926, President Calvin Coolidge created Public Water Reserve No. 107 through executive order, providing that water flows in springs and waterholes on public land in the West are reserved for public use. The reservation of federal water rights also included a withdrawal from entry of public lands within

Complaint for Declaratory & Injunctive Relief

one-quarter of a mile around each spring/waterhole. Public Water Reserve No. 107 provides:

> [I]t is hereby ordered that every smallest legal subdivision of public land surveys which is vacant, unappropriated, unreserved public land and contains a spring or water hole, and all land within one quarter of a mile of every spring or water hole located on unsurveyed public land, be, and the same is hereby, withdrawn from settlement, location, sale, or entry, and reserved for public use in accordance with the provisions of Section 10 of the Act of December 29, 1916.

40.     Exec. Order of Apr. 17, 1926. *See also United States v. State of Idaho*, 959 P.2d 449, 452 (1998) ("[Public Water Reserve No. 107] evidences an express intention by Congress that reserves a water right in the United States.").

**The National Landscape Conservation System Act**

41.     Congress established the National Landscape Conservation System ("NLCS") by statute in 2009. 16 U.S.C. §§ 7201–03. The purpose of the NLCS is to "conserve, protect, and restore nationally significant landscapes that have outstanding cultural, ecological, and scientific values for the benefit of current and future generations." *Id.* § 7202(a).

42.     The NLCS Act requires resources of the system to be managed in accordance with applicable laws and regulations and "in a manner that protects the values for which the components of the system were designated." *Id.* § 7202(c)(2).

43.     Lands included in the NLCS include national monuments, such as the Mojave Trails National Monument, as well as national conservation areas, wilderness study areas, and national scenic and historic trails. *Id.* § 7202(b). Lands within the Mojave Trails National Monument and lands designated as California Desert National Conservation Lands are included within the NLCS. *Id.* § 7202(b)(1)(A), (b)(2)(D).

**The Dingell Act**

44.     In 2019, Congress enacted the John D. Dingell, Jr. Conservation, Management, and Recreation Act (the "Dingell Act") Pub. L. No. 116-9, 133 Stat. 580

Complaint for Declaratory & Injunctive Relief

(2019). Title I of the Dingell Act, codified at 16 U.S.C. § 410aaa-81c, applies to various types of lands in the California Desert Conservation Area, including "acquired lands" which are defined as "any land acquired within the Conservation Area using amounts from the land and water conservation fund" and "donated" lands which are defined as "any private land donated to the United States for conservation purposes in the Conservation Area." *Id.* § 410aaa-81c(a)(1), (4). The Dingell Act imposes certain limitations on the use of acquired and donated lands including prohibiting the use of "acquired land . . . or donated land within the Conservation Area for any activities contrary to the conservation purposes for which the land was acquired . . . or donated, including . . . rights-of-way," *Id.* § 410aaa-81c(b), subject to certain exceptions, *Id.* § 410aaa-81c(c). As relevant here, for a right-of-way "the Secretary may authorize limited exceptions to prohibited uses of acquired or donated land in the Conservation Area if . . . after the completion and consideration of an analysis under the National Environmental Policy Act of 1969 (42 U.S.C. § 4321 *et seq.*), the Secretary has determined that proposed use is in the public interest," *Id.* § 410aaa-81c(c)(1)(B), with the inclusion of conditions enumerated in the statute at 16 U.S.C. § 410aaa-81c(c)(2). The conditions include mitigation requirements for additional donations of land within the California Desert Conservation Area "of comparable value" which can only be approved by the Secretary after "consultation, to the maximum extent practicable, with the donor of the private land proposed for nonconservation uses; and [] an opportunity for public comment regarding the donation." *Id.* § 410aaa-81c(c)(2)(A), (B)(i)–(ii).

**The National Environmental Policy Act**

45.    The National Environmental Policy Act declares "it is the continuing policy of the Federal Government . . . to use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331(a). NEPA establishes "a broad

15

Complaint for Declaratory & Injunctive Relief

national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989). NEPA "ensures that the agency and the public are aware of the environmental consequences of proposed projects" and "helps agencies to make better decisions." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 177 (2025). To meet those goals, NEPA requires that agencies "consider every significant aspect of the environmental impact of a proposed action" and inform the public of the environmental impacts of agency proposals. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 553 (1978)).

46.     To fulfill these purposes, NEPA requires that: (1) agencies take a "hard look" at the environmental impacts of their actions before the actions occur, thereby ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349–50.

47.     Where the proposed federal action "has a reasonably foreseeable significant effect on the quality of the human environment," the agency must prepare an Environmental Impact Statement ("EIS"). 42 U.S.C. § 4336(b)(1). "An EIS *must* be prepared if substantial questions are raised as to whether a project *may* cause significant degradation of some human environmental factor." *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864 (9th Cir. 2005) (citation omitted). "To trigger this requirement a plaintiff need not show that significant effects *will in fact occur*, but raising substantial questions whether a project may have a significant effect is sufficient." *Id.* at 864–65 (citation omitted). Agencies must also prepare an environmental impact statement "whenever a federal action is

Complaint for Declaratory & Injunctive Relief

controversial, that is, when substantial questions are raised as to whether a project may cause significant degradation of some human environmental factor or there is a substantial dispute about the size, nature, or effect of the major Federal action." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736 (9th Cir. 2001) (citation omitted). A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI, "casts serious doubt upon the reasonableness of an agency's conclusions." *Id.*

48.     An EIS must set forth:

(i) reasonably foreseeable environmental effects of the proposed agency action;
(ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;
(iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and
(v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

42 U.S.C. § 4332(C). In conducting a NEPA analysis an agency must ensure the "scientific integrity" of its analysis and make use of "reliable data and resources." *Id.* § 4332(D)–(E).

49.     Where the proposed action does not have a reasonably foreseeable significant effect, or its significance is unknown, the agency may prepare an environmental assessment ("EA") to determine whether the effect of the action is significant and thus requires an EIS, or is not significant, in which case the agency issues a finding of no significant impact ("FONSI"). *Id.* § 4336(b)(2).

Complaint for Declaratory & Injunctive Relief

50.     Public participation is integral to NEPA to ensure that "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349–50. The Ninth Circuit has held that "[a]n agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008). The Ninth Circuit has also required BLM to provide public participation periods that are "sufficiently long to permit members of the public to weigh in on the decision in an informed manner" and "for participants to obtain and absorb the environmental information provided by the agency and then prepare their own analyses and critiques, including consultation with experts where appropriate." *Mont. Wildlife Fed'n*, 127 F.4th at 38 (concluding BLM violated NEPA "when it eliminated in some instances and severely shortened in others the various public participation periods" for environmental documents like EAs).

**The Clean Air Act**

51.     The CAA establishes a comprehensive program for controlling and improving the nation's air quality through shared federal and state responsibility. The CAA authorizes the U.S. Environmental Protection Agency ("EPA"), the agency with primary regulatory authority under the Act, to establish National Ambient Air Quality Standards ("NAAQS") for serious pollutants known as "criteria pollutants," including ozone—the main ingredient in smog. 42 U.S.C. §§ 7407–10. The CAA requires every region in the U.S. to reach attainment of the NAAQS for all pollutants, and it has set timetables for attainment since the 1970s. *See id.* § 7407(a)–(d)(1)(A). Areas that fail to attain the NAAQS are designated "nonattainment areas." *Id.* § 7407(d)(1)(A)(i). For ozone, regions are assigned "marginal" to "extreme" classifications depending on the level of pollution. *Id.* § 7511(a)(1). Because ozone is the product of the interaction

between nitrogen oxides ("NOx") and volatile organic compounds ("VOCs"), control of ozone under CAA regulations consists of emissions limitations on these precursors. *See, e.g.*, 40 C.F.R. § 93.153(b)(1).

52.     Section 176(c)(1) of the CAA provides that no federal agency shall "engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to [a state implementation plan ("SIP")]." *Id*. § 7506(c)(1). Federal activities must not:

(i)     cause or contribute to any new violation of any standard in any area;

(ii)    increase the frequency or severity of any existing violation of any standard in any area; or

(iii)   delay timely attainment of any standard of any required interim emission reductions or other milestones in any area.

*Id*. § 7506(c)(1)(B).

53.     This is referred to as the "conformity" requirement (or the General Conformity Rule). A conformity determination is required for each criteria pollutant or precursor in a nonattainment or maintenance area where the total emissions caused by a federal action would equal or exceed the rates provided in the regulations. 40 C.F.R. § 93.153(b). Relevant here, this threshold is 100 tons of NOx or VOCs per year for "moderate" ozone nonattainment areas, 25 tons of NOx or VOCs per year for "severe" ozone nonattainment areas, and 10 tons per year of NOx or VOCs for "extreme" ozone nonattainment areas. *Id.* § 93.153(b)(1).

54.     Federal law prescribes a two-step process to conduct conformity review of federal actions. First, an agency must determine whether its action will result in emissions exceeding the applicable threshold (or *de minimis* level). *Id.* § 93.153(b)–(c).

55.     To determine a project's emissions are *de minimis*, the federal agency must show that total direct and indirect emissions, combined, are below the region's applicable thresholds. *Id.* § 93.153(b). Direct emissions are those that are caused by

Complaint for Declaratory & Injunctive Relief

the action and indirect emissions are those that may be separated by time or space but are of the type that the agency can practically control and for which the agency has continuing program responsibility. *Id.* § 93.152.

56.     If the threshold requirement is met, the agency must prepare a full "conformity determination." This determination requires agencies to publicly notice the action for public comment, and it requires agencies to ensure that pollution emissions are mitigated by (a) redesigning the action to reduce emissions, (b) reducing the same type of emissions elsewhere at the facility, or (c) securing offsets in the same nonattainment or maintenance area or an adjacent area with an equal or higher classification. *Id.* §§ 93.156, 93.158.

**FACTUAL BACKGROUND**

**The Cadiz Water Project**

57.     Cadiz, Inc. and its subsidiary Cadiz Real Estate, LLC, are for-profit corporations that have acquired over 34,000 acres of private land in the Mojave Desert, most of which is located within the large rectangular "donut hole" at the center of Mojave Trails National Monument. This property spans portions of the Fenner, Cadiz, and Bristol Valley watersheds, and it sits above the same underground aquifer basin that feeds springs, seeps and riparian areas within the Monument, Mojave National Preserve, Joshua Tree National Park, and other public lands. A map depicting the property ("Fenner Gap (Wellfields)") in relation to the affected watersheds is reproduced below.

20

Complaint for Declaratory & Injunctive Relief

Legend: Affected Watersheds | Affected Wilderness | Mojave National Preserve | Mojave Trails National Monument

58.     Cadiz Inc. formed "Fenner Gap Mutual Water Company" (collectively, Cadiz, Inc., Cadiz Real Estate, LLC, and Fenner Gap Mutual Water Company are referred to as "Cadiz") to construct and operate the "Cadiz Valley Water Conservation, Recovery and Storage Project" or "Cadiz Water Project." The Cadiz Water Project proposes to extract an average of 50,000 acre feet (an amount equivalent to 16.3 billion gallons) of groundwater every year for 50 years from the aquifer underlying Cadiz's property. Cadiz seeks to profit by selling the extracted groundwater through Fenner Gap Mutual Water Company, to municipal water districts and other users.

59.     The Cadiz Water Project will extract far more groundwater from the underlying aquifer than is replenished naturally each year, causing overdraft. Overall, the Cadiz Water Project would lower groundwater levels by at least 80 feet in the

Complaint for Declaratory & Injunctive Relief

aquifer system through unsustainable pumping, and it could take 390 years after the cessation of pumping for the aquifer to return to its current equilibrium.

60. The Cadiz Water Project will draw down the underlying aquifer and dewater springs, seeps, and other riparian areas in Mojave Trails National Monument, in wilderness areas, and other public lands, harming species that depend on these springs. A recent peer-reviewed study of springs across the Mojave Desert and Great Basin found that regional aquifer springs support disproportionately high numbers of endemic aquatic species and function as critical biodiversity hotspots preserving vulnerable endemic taxa. The study explained that such springs often provide the only reliable source of surface water in arid landscapes, serve as refugia for species found nowhere else, and are increasingly threatened by groundwater depletion. The authors concluded that conservation of regional aquifer desert springs should be a major priority because loss or degradation of spring flows can result in the extirpation or extinction of endemic species and the collapse of unique desert ecosystems.

61. The retreating aquifer will also desiccate desert "playa" lakebeds like Bristol and Cadiz Dry Lakes, resulting in toxic air pollution from windswept sediments akin to what has plagued the Owens Valley to the north ever since large-scale water diversions to Los Angeles dried Owens Lake a century ago.

62. For the Cadiz Water Project to proceed, Cadiz must secure a right-of-way across Mojave Trails National Monument and other BLM-managed public lands that surround its property for a water pipeline capable of conveying water from the wellfield to an existing aqueduct and/or other water conveyance offsite. A water pipeline across BLM-managed public lands with sufficient capacity is a critical component of the Cadiz Water Project, without which the Project is not economically viable and cannot proceed.

63. In 2011, Cadiz negotiated the purchase of an approximately 217-mile oil and gas pipeline owned by the El Paso Natural Gas Company that stretches from Cadiz's property northwest to Barstow and all the way to Interstate 5 near the Los

Complaint for Declaratory & Injunctive Relief

Angeles Grapevine, crossing the California Aqueduct, the Los Angeles Aqueduct, and the Mojave River Pipeline. Cadiz proposes to convert approximately 162 miles of this oil and gas pipeline, which has been unused since 2004, into a water pipeline capable of conveying up to 30,000 acre-feet from the Cadiz Water Project per year. Cadiz estimates it will cost more than $250 million to convert the pipeline to carry water.

64. The oil and gas pipeline crosses approximately 83 miles of federal lands, including 65 miles of BLM lands and 18 miles of Department of War lands located in San Bernardino and Kern Counties, California. A map depicting the pipeline route is reproduced below.



SOURCE: ESRI; BLM; ESA, 2026

Fenner Gap Mutual Water Company Northern Pipeline Conversion

65. The pipeline crosses over 11 miles of "acquired land" and/or of "donated land" as well as 66.79 acres of disturbance and 21.81 acres of road access, as defined in 16 U.S.C. § 410aaa-81c(a)(1), (4). These acquired and/or donated lands were

23

Complaint for Declaratory & Injunctive Relief

formerly private lands owned by the Catellus Company in the California desert that were donated to the U.S. Department of Interior for conservation by The Wildlands Conservancy.



Cadiz Catellus lands 3

66.    The pipeline is located within the Mojave Desert Air Basin and the San Joaquin Valley Air Basin. Both air basins experience degraded air quality and are designated by EPA as nonattainment areas for the NAAQS for ozone. As a result, emissions of the ozone precursor chemical NOx are a significant concern in both air basins. Portions of these air basins that the pipeline crosses are designated as in "extreme" nonattainment, "severe" nonattainment, and "moderate" nonattainment for ozone.

24

Complaint for Declaratory & Injunctive Relief

67.     The portion of the pipeline that crosses BLM lands is located within a right-of-way previously granted to El Paso Natural Gas Company under the Mineral Leasing Act of 1920, 30 U.S.C. § 185. On July 30, 2020, Cadiz applied to BLM (1) to reassign El Paso Natural Gas's Mineral Leasing Act right-of-way to Cadiz, and (2) to convert the Mineral Leasing Act right-of-way to a FLPMA Title V right-of-way. Cadiz's application confirmed the requested rights-of-way would allow the Cadiz Water Project to proceed. The application described the need for the proposed "project" broadly as to "increase flexibility and resiliency of the water supply" through "enhanced conveyance capacity[.]" The application explained that the "probable effects" of the "project" would include "open[ing] up additional, diversified, [water] supply options" for water users.

68.     On December 21, 2020, BLM both assigned the El Paso Natural Gas Company's Mineral Leasing Act right-of-way to Cadiz, and simultaneously issued Cadiz a right-of-way converting the Mineral Leasing Act right-of-way to a FLPMA Title V right-of-way. BLM did not issue any environmental analysis along with its decision, instead concluding that the decision was exempt from environmental review.

69.     On March 23, 2021, Plaintiffs challenged BLM's 2020 issuance of the rights-of-way to Cadiz as violating FLPMA, the Proclamation Establishing Mojave Trails National Monument, and NEPA. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. 2:21-cv-02507-GW-AS (C.D. Cal. filed Mar. 23, 2021). The case was related to *Native American Land Conservancy v. Haaland*, No. 5:21-cv-00496-GW-AS (C.D. Cal. filed Mar. 23, 2021), which challenged the issuance of the rights-of-way as violating the National Historic Preservation Act ("NHPA"), NEPA, and FLPMA.

70.     Rather than defend its unlawful decision, BLM sought a voluntary remand and vacatur of the rights-of-way. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. 2:21-cv-02507-GW-AS (C.D. Cal. filed Dec. 3, 2021). BLM admitted that the "legal errors" it made were "serious" when it granted the rights-of-

Complaint for Declaratory & Injunctive Relief

way without analyzing the source of the water that will be transported through the pipeline and the potential impacts on the environment or historic properties of drawing down the water at its source.

71.     The Court granted BLM's motion for voluntary remand on September 13, 2022. The Court found that "under the FLPMA, the BLM is required to 'take any action necessary to prevent unnecessary or undue degradation of the lands.' 43 U.S.C. § 1732(b). However, the BLM acknowledges that it 'conducted no analysis of the potential impacts of water drawdowns on Mojave Trails National Monument or other federal lands.'" *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. CV 21-2507-GW-ASX, 2022 WL 4233648, at *8 (C.D. Cal. Sept. 13, 2022). The Court found that BLM's failure to consider "whether the grant of the rights-of-way at issue complied with the FLPMA, the applicable land management plans, or the Mojave Trails National Monument Proclamation" was a failure to "consider 'an important aspect of the problem,'" and was thus "arbitrary and capricious." *Id.* (quoting *Kalispel Tribe of Indians v. U.S. Dep't of Interior*, 999 F.3d 683, 688 (9th Cir. 2021)). The Court further found that "[b]y too narrowly defining the project at issue to include only the transport of water, the BLM failed to evaluate the potential effects from the grant of the rights-of-way at issue on historic properties protected by the NHPA," in violation of the NHPA. *Id.* Finally, the Court also found that by failing to evaluate the potential impacts of drawing down water due to issuing the rights-of-way, BLM failed to satisfy its "hard look" obligation under NEPA. *Id.* at *7.

72.     In July, 2023, BLM announced it would seek public comment on its proposal to reassign El Paso Natural Gas's Mineral Leasing Act right-of-way to Cadiz, authorizing Cadiz to operate and maintain the existing oil and gas pipeline. U.S. Senators Diane Feinstein and Alex Padilla wrote to BLM requesting that it prepare a full environmental impact analysis on the reassignment. In response, BLM declined to conduct environmental review of water transport when approving the oil and gas pipeline transfer under the Mineral Leasing Act, but promised the Senators it

would not take the next step of allowing the oil and gas pipeline to be converted to carry water "without fully analyzing the environmental and historic resource impacts associated with a new use, e.g., the transport of water, consistent with the National Environmental Policy Act, Section 106 of the National Historic Preservation Act, and the Endangered Species Act." BLM acknowledged that "[d]ue to the sensitive nature of the federal lands surrounding the existing [Mineral Leasing Act right-of-way] and Cadiz's property, including the Mojave National Preserve, the Mojave Trails National Monument, and other specially designated lands with fragile ecosystems, the BLM anticipates that any [right-of-way] application seeking to use the existing pipeline to transport water would require intensive environmental studies of those potential impacts associated with the transport of water, including Cadiz's extraction of water from its underground aquifer, to the surrounding federal lands."

73. On information and belief, sometime in 2025, Cadiz's Fenner Gap Mutual Water Company applied to BLM for a FLPMA Title V right-of-way to convert the El Paso Natural Gas oil and gas pipeline to transport water.

74. BLM posted notice of the right-of-way application online, but it did not circulate the application materials or a draft environmental assessment for public review, and it did not provide a public comment period, despite FLPMA's requirement that BLM "give . . . the public adequate notice and an opportunity to comment upon . . . and to participate in . . . the management of[] the public lands." 43 U.S.C. § 1739(e).

75. A coalition of groups concerned about the impacts of the right-of-way approval, including Plaintiffs, nevertheless wrote to BLM on January 5, 2026, and again on February 22, 2026, imploring BLM to consider the impacts of its approval on groundwater drawdowns, and providing BLM with extensive scientific research showing that Cadiz's proposed groundwater pumping would deplete the ancient desert aquifer it seeks to pump from, "cutting off water to life and culture sustaining springs on public lands."

Complaint for Declaratory & Injunctive Relief

76.    Congressman Raul Ruiz, whose district includes the Cadiz Water Project, also wrote to Secretary Burgum in May, 2026, explaining that the "California Desert is a national treasure" and "strongly urg[ing]" BLM "to conduct a full and rigorous environmental and historic resource review as required under the National Environmental Policy Act (NEPA), the National Historic Preservation Act (NHPA), and the Endangered Species Act (ESA), including a comprehensive assessment of all impacts associated with groundwater extraction and conveyance." Congressman Ruiz noted that "[s]cientists within the Department of the Interior, including experts at the U.S. Geological Survey and the National Park Service, as well as peer-reviewed scientific literature, have raised serious concerns regarding the scale, permanence, and uncertainty of groundwater extraction on federal lands and surrounding communities. These concerns warrant thorough, independent review before any federal authorization proceeds."

77.    BLM conducted no such thorough independent review. Instead, on July 8, 2026—and without first providing a draft environmental assessment for public comment—BLM issued the final Environmental Assessment, Finding of No Significant Impact, and Record of Decision approving the Title V right-of-way to Fenner Gap Mutual Water Company for the purpose of transporting water through the former El Paso Natural Gas pipeline. The approved right-of-way authorizes conversion of the pipeline from an idle oil-and-gas pipeline into a water conveyance system capable of transporting groundwater extracted from the Cadiz Water Project to municipal and other customers throughout Southern California. As BLM has long recognized, the right-of-way is a critical component of the Cadiz Water Project and is necessary for Cadiz to market and sell water extracted from the desert aquifer system; BLM's Finding of No Significant Impact explicitly explains that the right-of-way's benefits include "providing access to a new reliable water supply for communities in Southern California."

Complaint for Declaratory & Injunctive Relief

78. Although BLM previously acknowledged that approval of a Title V right-of-way for water transport would require environmental review of "potential impacts associated with the transport of water, including Cadiz's extraction of water from its underground aquifer," BLM reversed course in the Environmental Assessment. BLM concluded that groundwater pumping associated with the Cadiz Water Project was not part of the federal action before it and therefore declined to prepare the "intensive environmental studies" that it had previously represented would be required before issuance of a Title V right-of-way. And while the Environmental Assessment includes an appendix summarizing environmental review of the impacts of Cadiz's pumping conducted by the Santa Margarita Water District and other agencies, BLM did not conduct any independent scrutiny of the findings of that review, did not solicit or incorporate the latest scientific information regarding groundwater recharge rates and impacts to springs. BLM also did not prepare a "Water (Groundwater) Supply Assessment" as required by the DRECP; did not analyze the impacts on Catellus Agreement lands; failed to address the impact that pumping will have on federal reserved water rights, including on springs within California Desert National Conservation Lands and the Mojave Trails National Monument; and failed to respond to comments, including those submitted by members of Congress, highlighting scientific analysis demonstrating significant impacts from Cadiz's proposed groundwater extraction on federal public land.

79. Even while excluding the significant impacts of groundwater extraction from review, BLM acknowledged that implementation of the approved right-of-way will require a massive pipeline-conversion construction project. According to the Environmental Assessment, the project corridor encompasses approximately 1,346 acres of right-of-way disturbance—an area more than ten times the size of Disneyland. This includes approximately 983 acres associated with the pipeline corridor itself and 349 acres associated with access roads. The approved corridor crosses extensive federal, state, military, and private lands, including approximately

Complaint for Declaratory & Injunctive Relief

454 acres of BLM-managed public lands and 144 acres of military lands. The project also includes construction of seven new pump stations, each occupying roughly two acres—including several built directly within Mojave Trails National Monument—together with installation of up to 140 air-release/air-vacuum valves and 140 blow-off facilities distributed along the pipeline, replacement of 16 miles of pipeline, and construction of a holding pond to retain "flushed and hydrostatic testing water." These facilities will require excavation, grading, equipment staging, construction of access roads for vehicular access, and the operation of heavy construction equipment throughout the project area, construction that the Environmental Assessment predicts will cost over $250 million and require more than 1,300 workers. This construction alone will have significant environmental impacts on biological resources, air quality, Catellus Agreement lands, and on "special designated areas" including the Mojave Trails National Monument. The Environmental Assessment does not fully analyze the impacts of these activities, however, on biological resources, air pollution, Catellus Agreement lands, or special designated areas like the Mojave Trails National Monument, but nevertheless concludes they are insignificant.

80.     Finally, BLM did not prepare a conformity determination under the Clean Air Act, instead concluding that the Project's emissions fall below applicable conformity thresholds. But BLM's own air-quality analysis does not substantiate this conclusion. BLM's own air-quality analysis indicates that construction-related emissions associated with implementation of the approved right-of-way and the groundwater-pumping project it was designed to facilitate will exceed *de minimis* thresholds. Moreover, BLM's air pollution calculations fail to take into account numerous construction activities authorized by BLM and are otherwise internally inconsistent with details of the project disclosed in the Environmental Assessment. As a result of its failure to adequately perform a conformity review, BLM did not undertake the associated agency consultation and public-review procedures required by the Clean Air Act, nor did BLM demonstrate through any authorized conformity

Complaint for Declaratory & Injunctive Relief

method—including enforceable mitigation measures or emissions offsets—that the project's emissions will not cause or contribute to new violations of federal air-quality standards, increase the frequency or severity of existing violations, or delay attainment or maintenance of such standards.

### FIRST CLAIM FOR RELIEF

### (Violations of FLPMA, the CDPA, the NLCS Act, the Dingell Act, Public Water Reserve No. 107, and the Proclamation Establishing Mojave Trails National Monument)

81.     Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding paragraphs.

82.     BLM's compliance with FLPMA, the CDPA, the NLCS Act, the Dingell Act, Public Water Reserve No. 107, and the Proclamation Establishing Mojave Trails National Monument are subject to judicial review under the APA. The APA provides that courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency must articulate satisfactory explanation for its action, including a rational connection between the facts found and the choices made. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency action is unlawfully arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. When an agency changes its position, and its new position rests upon factual findings that contradict those which underly its prior position, "a reasoned explanation is needed for disregarding facts and circumstances that underlay" the prior position. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). Any unexplained inconsistency between the prior policy and its

Complaint for Declaratory & Injunctive Relief

replacement is a basis for finding the agency's interpretation arbitrary and capricious. *Id.*; *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016).

83.     Here, BLM acted arbitrarily and capriciously and in violation of the public-land protection and land-use-planning requirements of FLPMA, the CDPA, the NLCS Act, the Dingell Act, Public Water Reserve No. 107, and the Proclamation Establishing Mojave Trails National Monument by failing to evaluate and protect Mojave Trails National Monument resources, NLCS resources, wilderness resources, Catellus Agreement lands, and reserved water rights.

84.     First, under FLPMA, BLM's decisions must conform to the California Desert Conservation Area Plan, as amended by the Desert Renewable Energy Conservation Plan. 43 U.S.C. § 1781; 43 U.S.C. § 1732(a). The DRECP requires that "for any activity that proposes to utilize groundwater resources," "[a] Water (Groundwater) Supply Assessment shall be prepared in conjunction with the activity's NEPA analysis and prior to an approval or authorization." The DRECP explains that "[t]he purpose of the Water Supply Assessment is to determine whether over-use or over-draft conditions exist within the project basin(s), and whether the project creates or exacerbates these conditions." The sole purpose of the Title V right-of-way challenged in this case is to transport groundwater extracted from the Cadiz aquifer system. It therefore triggers the DRECP requirement. BLM's issuance of the Title V right-of-way and determination that it is consistent with the DRECP, without conducting a Water (Groundwater) Supply Assessment, violates the DRECP and FLPMA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

85.     Second, the DRECP provides detailed information about the Nationally Significant Values within the California Desert National Conservation Lands and includes objectives and management actions BLM must implement to protect those values. BLM concluded that the right-of-way would not "negatively affect the values for which the California Desert National Conservation Lands are designated," but

without addressing the impacts of the groundwater drawdown on the values of the California Desert National Conservation Lands that will be affected, including springs. BLM's issuance of the Title V right-of-way and determination that it is consistent with the DRECP, without providing a reasoned explanation, supported by substantial evidence, demonstrating how issuance of the right-of-way meets the requirements of the DRECP's objectives and management actions for California Desert National Conservation Lands, violates the DRECP and FLPMA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

86.    Third, the DRECP requires that for Catellus Agreement lands, any proposed use of these lands must be consistent with the deed restrictions and conservation purposes governing their acquisition and that activities must be subject to review and approval by the California State Director. *See* LUPA-LANDS-6; LUPA-LANDS-7. The pipeline crosses significant portions of Catellus Agreement lands and the water drawdown will also affect conservation values on other acquired and/or Catellus Agreement lands. BLM's issuance of the right-of-way, without analyzing or ensuring compliance with LUPA-LANDS-6 or LUPA-LANDS-7, violates the DRECP and FLPMA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

87.    Fourth, the Dingell Act prohibits the use of "acquired land . . . or donated land within the Conservation Area for any activities contrary to the conservation purposes for which the land was acquired . . .  or donated, including . . . rights-of-way," 16 U.S.C. § 410aaa-81c(b), unless "the Secretary has determined that proposed use is in the public interest," 16 U.S.C. § 410aaa-81c(c)(1)(B), with the inclusion of conditions enumerated in 16 U.S.C. § 410aaa-81c(c)(2). The conditions include mitigation requirements for additional donations of land within the California Desert Conservation Area "of comparable value," which can only be approved by the Secretary after "consultation, to the maximum extent practicable, with the donor of the private land proposed for nonconservation uses and [] an opportunity for public

33
Complaint for Declaratory & Injunctive Relief

comment regarding the donation." *Id.* The pipeline crosses significant portions of acquired and/or donated land and the water drawdown will also affect conservation values on other acquired and/or donated lands—contrary to the purposes for which the land was acquired or donated. BLM's failure to address the Dingell Act before issuing the new Title V right-of-way, including its failure to (1) make a statutory public-interest determination under Section 410aaa-81c(c)(B), (2) require the permittee to donate private land of comparable value, and (3) provide an opportunity for public comment regarding the donation, violates the Dingell Act and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law

88.    Fifth, FLPMA provides that, "prior to granting or issuing a right-of-way . . . for a new project which may have a significant impact on the environment," BLM "shall require the applicant to submit a plan of construction, operation, and rehabilitation for such right-of-way" that complies with BLM's terms and conditions. 43 U.S.C. § 1764(d). BLM's terms and conditions must, among other things, "minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment" and "protect Federal property and economic interests." 43 U.S.C. § 1765. The Cadiz Water Project will have a significant impact on the environment. BLM's issuance of the FLPMA right-of-way, without specifying sufficient terms and conditions for operation of the right-of-way that will "minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment" and "protect Federal property and economic interests," including federal reserved water rights under the CDPA and Public Water Reserve No. 107, violates FLPMA and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

89.    Sixth, FLPMA requires BLM to "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). For areas within the California Desert Conservation Area, FLPMA also requires BLM to ensure "immediate and future protection and administration of the public lands in the

California desert" and "the maintenance of environmental quality." 43 U.S.C. § 1781(b). The NLCS Act also requires resources of the system, including California Desert National Conservation Lands managed by BLM, to be managed in accordance with applicable laws and regulations and "in a manner that protects the values for which the components of the system were designated." 16 U.S.C. § 7202(c)(2). BLM concluded that the right-of-way "would be used in a manner that prevents unnecessary or undue degradation to public lands" while simultaneously declining to meaningfully evaluate the groundwater drawdown, spring depletion, air-quality, and other public-land impacts that the right-of-way is designed to facilitate. BLM failed to provide a reasoned explanation, supported by substantial evidence, demonstrating how issuance of the right-of-way satisfies FLPMA's public-land protection mandates and protects springs on California Desert National Conservation Lands. BLM's issuance of the right-of-way therefore violates FLPMA and the NLCS Act and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

90.    Seventh, the CDPA requires the Secretary and BLM to "take all steps necessary to protect" federal reserved water rights in springs in the wilderness areas, 16 U.S.C. § 410aaa-76(a), (b). Public Water Reserve No. 107 also requires protection of reserved water rights in springs and on the quarter-mile of surrounding reserved lands on all western public lands. BLM's approval of the right-of-way will facilitate the Cadiz Water Project's groundwater pumping, which is predicted to cause Bonanza Spring on California Desert National Conservation Lands and other springs with federal reserved rights established in the CDPA and/or established under Public Water Reserve No. 107 to be eliminated or have substantially reduced flows. BLM's issuance of the right-of-way, without ensuring protection of federal reserved water rights, violates the CDPA and Public Water Reserve No. 107 and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

91.    Eighth, BLM must comply with the requirements of the Mojave Trails National Monument Proclamation, 43 U.S.C. § 1732(a), and must manage national

35

Complaint for Declaratory & Injunctive Relief

monument lands "in a manner that protects the values for which the components of the system were designated." 16 U.S.C. § 7202(c)(2). The Mojave Trails National Monument Proclamation requires that BLM may only allow assignments of and modifications to pipelines located within the Mojave Trails National Monument if they are "consistent with the care and management" of the Monument objects. 81 Fed. Reg. at 8375. The Proclamation similarly provides that existing pipelines within the Monument "may be expanded . . . only to the extent consistent with the care and management" of Monument objects. *Id.* The Mojave Trails National Monument Proclamation also directs the Secretary of Interior to "work with appropriate State officials to ensure the availability of water resources, including groundwater resources, needed for monument purposes." 81 Fed. Reg. at 8375. In approving the right-of-way, BLM concluded that it is consistent with the Mojave Trails National Monument Proclamation. BLM, however, failed to provide a reasoned explanation demonstrating how conversion of the pipeline to transport groundwater, construction and operation of pump stations and associated facilities, installation of up to 140 air-release and air-vacuum valves and 140 blow-off facilities, and the long-term operation of the project are consistent with the protection of the Monument objects identified in the Proclamation. BLM likewise failed to adequately analyze whether the Project would impair, diminish, or undermine those objects. BLM's issuance of a right-of-way without demonstrating it is consistent with the Mojave Trails National Monument violates the proclamation establishing the Mojave Trails National Monument and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

92. Ninth, Section 309(e) of FLPMA requires BLM to "give . . . the public adequate notice and an opportunity to comment upon . . . and to participate in . . . the management of[] the public lands." 43 U.S.C. § 1739(e). The Ninth Circuit has explained that FLPMA specifically requires BLM to "provide opportunities for public participation . . . for down-the-line decisions" like whether to issue right-of-way. *Mont. Wildlife Fed'n*, 127 F.4th at 40. BLM's failure to provide for a public

36

Complaint for Declaratory & Injunctive Relief

participation opportunity is contrary to FLPMA and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

93.    Finally, BLM previously acknowledged that its approval of a Title V right-of-way for water transport requires analysis of groundwater extraction and its impacts on surrounding federal lands under FLPMA. BLM subsequently reversed that position and concluded that groundwater extraction falls outside the scope of the federal action. BLM failed to provide a reasoned explanation for that reversal or for disregarding the factual findings and circumstances underlying its previous position. This unexplained change in position violates FLPMA and renders approval of the right-of-way arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## SECOND CLAIM FOR RELIEF

### (Violations of NEPA)

94.    Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding paragraphs.

95.    BLM's compliance with NEPA is subject to judicial review under the APA, which authorizes the court to set aside arbitrary and capricious agency action.

96.    Here, BLM acted arbitrarily and capriciously in violation of NEPA. First, NEPA's purpose is to ensure that an agency, "in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349. The Ninth Circuit has recently held that NEPA requires BLM to provide public participation periods for its environmental documents that are "sufficiently long to permit members of the public to weigh in on the decision in an informed manner," and "for participants to obtain and absorb the environmental information provided by the agency and then prepare their own analyses and critiques, including consultation with

37

experts where appropriate." *Montana Wildlife Fed'n*, 127 F.4th at 38. BLM's failure to provide for a public participation opportunity on the Environmental Assessment and allow the public to weigh in is contrary to NEPA and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

97. Second, NEPA requires BLM to take a "hard look" at all reasonably foreseeable environmental impacts and adverse effects of the right-of-way, *Robertson*, 490 U.S. at 349–50; 42 U.S.C. § 4332(C), and to prepare an EIS for agency actions that have reasonably foreseeable significant effects on the quality of the environment. By failing to take a hard look at the effects of operation of the right-of-way on water drawdowns and failing to take a hard look at all environmental impacts from construction of pipeline conversion, BLM has failed to consider important aspects of the problem. BLM's failure to disclose and adequately analyze all significant and adverse environmental impacts of its right-of-way approval is contrary to NEPA and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

98. Third, BLM's issuance of the right-of-way is a major Federal action significantly affecting the quality of the human environment, within the meaning of NEPA. The project will cause significant impacts to environmentally sensitive resources, including groundwater-dependent ecosystems, desert springs, resources protected within Mojave Trails National Monument and California Desert National Conservation Lands, federal reserved water rights, Catellus Agreement lands, and local air quality. The action is also highly controversial, as demonstrated by longstanding calls from federal agencies, scientists, public commenters, and members of Congress for BLM to analyze the impact of the right-of-way on groundwater recharge, groundwater connectivity, and impacts to springs and groundwater-dependent ecosystems. BLM's issuance of a FONSI and failure to prepare an EIS is contrary to NEPA and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

99. Fourth, NEPA requires agencies to ensure the scientific integrity of

Complaint for Declaratory & Injunctive Relief

environmental analyses and make use of reliable data and resources. 42 U.S.C. § 4332(D), (E). By refusing to evaluate scientific evidence regarding groundwater connectivity, groundwater-dependent ecosystems, spring flows, and groundwater recharge, while simultaneously disclaiming responsibility for analyzing the very impacts the right-of-way was designed to facilitate, BLM unlawfully failed to ensure the scientific integrity of its environmental review.

100. Finally, BLM's failure to provide an adequate justification for reversing its determination that it must evaluate the impact of granting the right-of-way on water drawdowns violates NEPA and renders BLM's decision to grant the right-of-way arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## THIRD CLAIM FOR RELIEF

### (Violation of the Clean Air Act)

101. Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

102. BLM's compliance with the Clean Air Act is subject to judicial review under the APA, which authorizes the Court to set aside arbitrary and capricious agency action.

103. Here, BLM acted arbitrarily and capriciously in violation of the Clean Air Act. First, under the Clean Air Act, a conformity determination is required where total direct and indirect emissions of a criteria pollutant or precursor caused by the federal action equal or exceed the applicable *de minimis* rates. 40 C.F.R. § 93.153(b). BLM's own air-quality analysis demonstrates that construction associated with the Cadiz Water Project and the pipeline conversion would generate significant construction-related emissions of nitrogen oxides, a precursor to ozone pollution. In the Environmental Assessment's supporting air-quality worksheet, BLM calculates that final construction emissions connected to the Cadiz Water Project and pipeline conversion will emit NOx in amounts exceeding 429.70 pounds per day, well above the 137-pound-per-day significance threshold applied in the worksheet. Yet BLM's

Complaint for Declaratory & Injunctive Relief

Environmental Assessment separately reports only 3.08 tons per year in total construction-related NOx emissions and did not explain or reconcile the materially different daily and annual calculations. BLM's failure to make a conformity determination, despite its finding of significant NOx emissions, is contrary to the CAA and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

104.   Second, all direct and indirect sources of emissions must be accurately included in an agency's conformity review calculations to lawfully substantiate a finding that a project's emissions fall under the applicable thresholds triggering a conformity determination. 40 C.F.R. § 93.153(b). BLM's pollution emissions estimates do not accurately include all direct and indirect sources of emissions because they substantially understate and/or fail to account for the full scope of pipeline conversion construction emissions. For example, BLM calculated maximum-daily NOx emissions of 7.65 pounds per day for only "1 Unit" of "AR/AV & BO Installation," even though the Environmental Assessment states that the pipeline conversion may require installation of up to 140 new air-release/air-vacuum valves ("AR/AVs") and 140 new blow-offs ("BOs"). Properly accounting for all installations could materially increase project emissions and could cause emissions to exceed one or more applicable General Conformity *de minimis* thresholds. BLM's air pollution calculations also omitted entirely emissions from other construction and operation activities disclosed in the Environmental Assessment, including construction of new access roads, replacement of 16 miles of existing pipeline, construction of a holding pond, water-truck travel, worker and vendor travel on primitive unpaved roads, and emissions from ongoing pipeline and pump station inspection trips, which BLM estimates to take place on a daily basis across the length of the pipeline. BLM further used modeling assumptions inconsistent with its own project description, including assuming "1 acre per [pump] station" in its emissions model, even though the Environmental Assessment states that each pump station would occupy approximately

Complaint for Declaratory & Injunctive Relief

two acres; assuming pipeline rehabilitation would only take four months in its emissions model even though the Environmental Assessment states that it will likely take six to eight months; and assuming only five to ten workers for each of the four project components it estimates emissions from, even though the Environmental Assessment's economic analysis predicts the construction project will directly support 1,302 jobs and $225.5 million in construction activity in 2026. BLM's determination that emissions are *de minimis*, and its associated failure to make a conformity determination, is contrary to the CAA and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Issue a declaratory judgment that BLM violated the law as described in this complaint;

B.    Vacate and set aside BLM's Environmental Assessment, Finding of No Significant Impact, and Decision to issue the FLPMA Title V right-of-way to FGMWC;

C.    Enjoin BLM from authorizing or otherwise allowing FGMWC or any Cadiz entity to undertake any activities within the right-of-way at issue;

D.    Award Plaintiffs their costs of litigation, including reasonable attorneys' fees and costs;

E.    Grant Plaintiffs such additional relief as the Court may deem proper; and

F.    Retain continuing jurisdiction of this matter until BLM fully remedies the violations of law complained of herein.

Respectfully submitted,

Dated: July 28, 2026        /s/ Elizabeth B. Forsyth
                            ELIZABETH B. FORSYTH (CA Bar No. 288311)
                            eforsyth@earthjustice.org
                            EARTHJUSTICE
                            810 3rd Ave #610

41

Seattle, WA 98104
Tel: (206) 531-0841

GREGORY C. LOARIE (Bar No. 215859)
gloarie@earthjustice.org
EARTHJUSTICE
180 Steuart St. #194330
San Francisco, CA 94105
Tel: (415) 217-2000

*Counsel for All Plaintiffs*

LISA T. BELENKY (CA Bar No. 203225)
ARUNA M. PRABHALA (CA Bar No. 278865)
lbelenky@biologicaldiversity.org
aprabhala@biologicaldiversity.org
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway Street, Suite 800
Oakland, CA 94612
Tel: (510) 844-7100


*Counsel for Plaintiff Center for Biological Diversity*

42

Complaint for Declaratory & Injunctive Relief